**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MOUSSA DIAW** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 26-761** |
| | : | |
| **JAMAL L. JAMISON, MICHAEL T. ROSE** | : | |

**MEMORANDUM**

**MURPHY, J.** **August 25, 2026**

Petitioner Moussa Diaw was arrested by Immigration and Customs Enforcement (ICE) during a check-in appointment on February 5, 2026. At the time of his arrest, Mr. Diaw had a final order of removal, but was living under supervised release and complying with the conditions of that release. After receiving Mr. Diaw's habeas petition, we asked the government to explain its process for revoking Mr. Diaw's release. The government's minimal response did not provide evidence that ICE revoked Mr. Diaw's release under proper authority nor that Mr. Diaw received adequate notice or an opportunity to respond to his detainment. We then held an evidentiary hearing and gave the government the opportunity to offer testimony from relevant officials, but the government declined to produce witnesses. Instead, at the hearing, the government admitted facts establishing a clear basis to grant the petition.

Mr. Diaw now moves for $7,245.63 of attorneys' fees under the Equal Access to Justice Act (EAJA). To defeat such a motion, the government must show that its opposition to Mr. Diaw's habeas motion was "substantially justified" — meaning "justified to a degree that could satisfy a reasonable person." *Johnson v. Gonzales*, 416 F.3d 205, 210 (3d Cir. 2005) (citation modified). Here, the government took positions that were contrary to record evidence and declined to supplement the record when given every opportunity to do so. We thus find the

government's position was not substantially justified and award Mr. Diaw attorneys' fees in the amount of $7,245.63.

**I. <u>Background</u>**

Mr. Diaw is a Senegalese citizen who entered the United States without inspection on January 27, 2022 in Del Rio, Texas.[1] DI 1 at ¶ 14; DI 4 at 8.[2] When Customs and Border Patrol intercepted Mr. Diaw, they detained him and initiated expedited removal proceedings. DI 4 at 8. Mr. Diaw expressed fear of returning to Senegal, and thus he was referred to United States Citizenship and Immigration Services (USCIS) for a credible fear interview. *Id*. On February 18, 2022, USCIS made a negative finding of credible fear, and an immigration judge (IJ) affirmed USCIS's determination on March 1, 2022. *Id.*; *see also* DI 4-2. The IJ's decision made Mr. Diaw's expedited removal order final, and he was turned over to Immigration and Customs Enforcement (ICE) for removal. DI 4 at 8.

On March 15, 2022, ICE released Mr. Diaw on an Order of Supervision (OSUP) "[b]ecause the agency ha[d] not effected [his] deportation or removal during the period prescribed by law."[3] *See* DI 1-3 at 2; *see also* DI 25 at 5. Mr. Diaw settled in New York and then moved to Philadelphia. DI 25 at 6. He married,[4] and had a daughter. During this time he also complied with the conditions of his OSUP, including attending regularly scheduled check-

[1] We take these facts from the written record as well as from Mr. Diaw's hearing testimony, which we found entirely credible and which was not contested by the government in any material respect.

[2] We adopt the sequential pagination supplied by the CM/ECF docketing system.

[3] As we explain below, ICE has a default period of 90 days to remove an alien with a final order of removal. *See* 8 U.S.C. § 1231.

[4] Mr. Diaw's wife is a U.S. citizen, and she filed a Form I-130 Petition for Alien Relative for him which remains pending. DI 1 at ¶ 16.

ins with ICE. DI 1 at ¶¶ 15-16;- DI 25 at 5-7.

On February 5, 2025, Mr. Diaw traveled to the ICE Philadelphia Office for a check-in. DI 9-1 at ¶ 2. He was accompanied by his wife and daughter. *Id.* Mr. Diaw handed his OSUP to an ICE employee, and the employee told him to fill out basic paperwork about himself including his email, his number, if he had a family, if he took drugs, and if he was on any medication. DI 25 at 8. Mr. Diaw completed this paperwork. *Id.*

Around 45 minutes later, ICE agents told Mr. Diaw to accompany them into a back room. DI 9-1 at ¶ 3. There, the ICE agents informed Mr. Diaw that he was being arrested because of his removal order. DI 25 at 10. Mr. Diaw responded that he never missed a check-in, to which an agent said, "we have a new administration." *Id.* The agents then handcuffed Mr. Diaw's hands and feet and forced him to change into prison clothes. DI 9-1 at ¶ 3. After this, an agent allowed Mr. Diaw to make short calls to his wife and lawyer. *Id.* at ¶ 4; DI 25 at 11.

About two hours later, an ICE agent handed Mr. Diaw a "Notice of Revocation of Release." DI 9-1 at ¶ 5; DI 25 at 11; DI 4-3 at 3-4. Mr. Diaw did not understand the notice because it was written in English. DI 9-1 at ¶ 5. Soon after that, ICE transported Mr. Diaw to the Federal Detention Center (FDC) in Philadelphia where he was detained. *Id.*

A few days later, two ICE agents visited Mr. Diaw at the FDC. DI 25 at 12. The agents asked him for his identification — which he turned over — and inquired what language he spoke, to which he said a little English, and Wolof. DI 25 at 12. The officers then told him they had no information about his case, but that he could be transferred to another facility soon. *Id.* at 13. No other ICE officers visited Mr. Diaw for the remainder of his time in custody. *Id.*

## II. <u>Procedural History</u>

On February 6, 2026, Mr. Diaw filed a petition for habeas corpus pursuant to 28 U.S.C.

§ 2241, arguing that ICE unlawfully revoked his OSUP. DI 1. Following the government's opposition brief (DI 4), we ordered the government to provide supplemental briefing and additional documentary evidence about the steps leading up to Mr. Diaw's detention. DI 7. We also ordered Mr. Diaw to provide a declaration of what happened when he arrived at ICE headquarters on February 5, 2026. *Id.*

After reviewing this briefing (*see* DI 8 and 9), we set an evidentiary hearing for March 11, 2026, and informed the parties that our focus would be on whether ICE complied with its own regulations in revoking Mr. Diaw's OSUP. DI 10. We also told the parties that we would like to hear testimony from Mr. Diaw, ICE's Acting Field Office Director Michael Rose (who the government indicated was responsible for revoking Mr. Diaw's OSUP), and any other ICE employees who the government would like to present. *Id.* Two days before our hearing, the government filed a letter saying that it did not intend to present any witnesses and that it would rely on the evidence already submitted to us. DI 12.

At the hearing, we heard testimony from Mr. Diaw. We then heard argument from Mr. Diaw and the government on whether Mr. Diaw's OSUP was lawfully revoked. Ultimately, we concluded that ICE violated its regulations in revoking Mr. Diaw's OSUP, and thus, pursuant to the Administrative Procedures Act (APA), we set aside the government's revocation of Mr. Diaw's OSUP as arbitrary and capricious or otherwise not in accordance with the law. Accordingly, we released Mr. Diaw. DI 25 at 30-32.

A little under three months later, on June 9, 2026, Mr. Diaw filed a motion pursuant to the Equal Access to Justice Act (EAJA) for an award of attorneys' fees and expenses incurred in

successfully challenging his detention. DI 18. All told, Mr. Diaw requests $7,245.63. DI 18. The government opposes Mr. Diaw's motion. DI 21.

## III. Analysis

Under the EAJA, we may award fees and expenses to a prevailing party against the United States, unless we "find[] that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A).[5] For the government's position to be substantially justified, it must demonstrate, "(1) a reasonable basis in truth for the facts alleged; (2) a reasonable basis in law for the theory it propounded; and (3) a reasonable connection between the facts alleged and the legal theory advanced." *Michelin*, 169 F.4th 418, at 433 (citation modified).

In immigration cases specifically, "the [g]overnment must meet the substantially justified test twice: once for its underlying conduct and once for its decisions in the ensuing litigation about that conduct." *Id.* (citation modified). "The [g]overnment bears the burden of proving its position was justified," *id.*, but we "must not assume that the government's position was not substantially justified simply because the government lost on the merits." *Johnson*, 416 F.3d at 210 (citation modified).

---

[5] On August 12, 2026 the government asked us to place petitioner's attorneys' fees motion in abeyance because the Supreme Court recently granted cert on a threshold question of whether habeas petitioners in immigration detention can recover attorneys' fees under the EAJA. *See* DI 27. However, we decline to grant the government's request because we have binding Third Circuit precedent holding that "the EAJA unambiguously applies to habeas challenges to immigration detention under 28 U.S.C. § 2241." *Michelin v. Warden Moshannon Valley Corr. Ctr.*, 169 F.4th 418, 432 (3d Cir. 2026). We are not at liberty to question the Third Circuit's precedent, so we think the soundest first step is to apply that binding precedent, and if the government seeks a stay of this modest judgment, it is free to pursue that with us or the Third Circuit.

Here, as we explain below, the record on the government underlying conduct — its revocation of Mr. Diaw's OSUP — is incomplete. Therefore, we focus our analysis on the government's defense of ICE's actions in the ensuing litigation. For the following reasons, we find that the government's opposition to Mr. Diaw's habeas petition was not substantially justified and thus we award Mr. Diaw attorneys' fees.[6]

### A. The government's defense of Acting Field Office Director Michael Rose's revocation of Mr. Diaw's OSUP was not substantially justified

As background, 8 U.S.C. § 1231 governs the detention and removal of aliens ordered removed like Mr. Diaw. *See Johnson v. Guzman Chavez*, 594 U.S. 523, 526 (2021). The statute provides that, "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days." § 1231(a)(1)(A). Once that period elapses, the Attorney General has discretion to either "detain[] [the alien] beyond the removal period" or release the alien "subject to [] terms of supervision" prescribed by the Attorney General. § 1231(a)(6); *see also* § 1231(a)(3).

The Attorney General's regulations for granting and revoking release for aliens with final orders of removal are found in 8 C.F.R. § 241.4.[7] The most pertinent part of this regulation is

[6] The government does not contend, nor do we find, that this case has any special circumstances that make a fee award unjust.

[7] Mr. Diaw argued at the hearing that his OSUP was revoked pursuant to 8 C.F.R. § 241.13, while the government maintained that he was detained pursuant to 8 C.F.R. § 241.4. We sided with the government in this dispute as § 241.13 is limited to cases "where the alien has provided good reason to believe there is no significant likelihood of removal to the country to which he or she was ordered removed, or to a third country, in the reasonably foreseeable future." § 241.13(a). We did not see sufficient evidence in the record that Mr. Diaw had made this showing. *See also E.M.M. v. Almodovar*, No. 25-CV-08212 (MMG), 2025 WL 3077995, at *4 (S.D.N.Y. Nov. 4, 2025) ("[T]he procedures of Section 241.13—including its revocation procedure codified at 241.13(i)(2)—only become available to the Government after an alien [makes] an initial showing that there [is] no likelihood the Government could remove him or her, causing the Government to release the alien pursuant to Section 241.13's special review

§ 241.4(l), which reads:

> (l) Revocation of release—
>
> > (1) Violation of conditions of release. Any alien described in paragraph (a) or (b)(1) of this section who has been released under an order of supervision or other conditions of release who violates the conditions of release may be returned to custody. Any such alien who violates the conditions of an order of supervision is subject to the penalties described in section 243(b) of the Act. Upon revocation, the alien will be notified of the reasons for revocation of his or her release or parole. The alien will be afforded an initial informal interview promptly after his or her return to Service custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification.
> >
> > (2) Determination by the Service. The Executive Associate Commissioner shall have authority, in the exercise of discretion, to revoke release and return to Service custody an alien previously approved for release under the procedures in this section. A district director may also revoke release of an alien when, in the district director's opinion, revocation is in the public interest and circumstances do not reasonably permit referral of the case to the Executive Associate Commissioner. Release may be revoked in the exercise of discretion when, in the opinion of the revoking official:
> >
> > (i) The purposes of release have been served;
> >
> > (ii) The alien violates any condition of release;
> >
> > (iii) It is appropriate to enforce a removal order or to commence removal proceedings against an alien; or
> >
> > (iv) The conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate.
> >
> > (3) Timing of review when release is revoked. If the alien is not released from custody following the informal interview provided for in paragraph (l)(1) of this section, the [Headquarters Post–Order Detention Unit] Director shall schedule the review process in the case of an alien whose previous release or parole from immigration custody pursuant to a decision of either the district director, Director of the Detention and Removal Field Office, or

---

procedures.”).

> Executive Associate Commissioner under the procedures in this section has been or is subject to being revoked. The normal review process will commence with notification to the alien of a records review and scheduling of an interview, which will ordinarily be expected to occur within approximately three months after release is revoked. That custody review will include a final evaluation of any contested facts relevant to the revocation and a determination whether the facts as determined warrant revocation and further denial of release. Thereafter, custody reviews will be conducted annually under the provisions of paragraphs (i), (j), and (k) of this section.

At our hearing, the government maintained that ICE revoked Mr. Diaw's OSUP pursuant to § 241.4(l)(2)(iii). *See* DI 25 at 26; *see also* DI 8 at 4. Under this subsection, only an Executive Associate Commissioner or a district director has the authority to revoke an alien's release. Moreover, if a district director revokes the alien's release, then the district director must be of the opinion that revocation is in the public interest and circumstances do not reasonably permit referral of the case to the Executive Associate Commissioner (EAC). *See* § 241.4(l)(2).

Here, Mr. Diaw's OSUP was revoked by Acting Field Office Director Michael Rose, who the government argued is the functional equivalent of a district director following the reorganization of the Immigration and Naturalization Service into the Department of Homeland Security. *See* 8 C.F.R. § 1.2; DI 8 at 2-3. Accepting this premise as true, we asked the government at the hearing what evidence it had that Mr. Rose was of the opinion that revocation was in the public interest and circumstances did not reasonably permit referral to the EAC:

> The Court: Okay. So I guess then the first question is, would you agree with me that to exercise that discretion under [§ 241.4(l)(2)(iii)], above that in [§241.4(l)(2)], that a district director must be of the opinion that revocation is in the public interest?
>
> Government Counsel: That is correct. It is in [Mr. Rose's] discretion to determine whether the revocation would be in in the public interest.
>
> The Court: Okay. Is there any evidence in this record that Mr. Rose is of

> that opinion?
>
> Government Counsel: There is no evidence as to that discretionary determination that was made.
>
> ***
>
> The Court: So with respect to the tail end of that same sentence, would you agree with me that [§241.4(l)(2)] also requires that circumstances do not reasonably permit referral of the case to the Executive Associate Commissioner?
>
> Government Counsel: That's another discretionary determination that the district director, also known as the field office director [] have to make.
>
> The Court: Is there any evidence in the record that, in Mr. Rose's view, circumstances did not reasonably permit referral of the case to the Executive Associate Commissioner?
>
> Government Counsel: I do not have any evidence of that determination, Your Honor.

DI 25 at 26-27.

Put simply, we do not think the government was substantially justified in defending ICE's revocation of Mr. Diaw's OSUP without evidence that Mr. Rose made these required determinations. Administrative agencies are bound by their own regulations. *See Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required."); *Leslie v. Att'y Gen. of U.S.,* 611 F.3d 171, 175 (3d Cir. 2010) ("[R]ules promulgated by a federal agency that regulate the rights and interests of others are controlling upon the agency."). Thus, to defend ICE's conduct, the government needed proof that the Agency complied with the requirements established in § 241.4(l)(2). But the government did not submit this evidence, did not produce any witnesses at

the hearing who might fill that gap (despite us asking), and yet still defended ICE's conduct. For purposes of EAJA, that is enough to warrant a fee award.

The government counters with several arguments that are not persuasive. First, the government cites to Mr. Diaw's "OSUP Revocation Worksheet" — *see* DI 8-1 — as evidence that ICE's revocation of Mr. Diaw's release went through multiple layers of review before reaching Mr. Rose's desk. Indeed, this worksheet documents that Mr. Diaw's OSUP was preliminarily reviewed by a Deportation Officer, Supervisory Detention and Deportation Officer, Assistant Field Office Director, and Deputy Field Office Director. But the government does not explain, nor can we ascertain, how this worksheet — with no notes from Mr. Rose himself — shows that Mr. Rose was of the opinion that revocation was in the public interest and circumstances did not reasonably permit referral to the EAC. The government also produced Mr. Diaw's "Notice of Revocation of Release," which is signed by Mr. Rose. But Mr. Rose makes no findings on the notice that he was of the opinion that revocation was in the public interest nor that circumstances did not reasonably permit referral to the EAC. *See* DI 4-3.

The government next cites to Mr. Diaw's Form I-213 — *see* DI 4-1 — as evidence that ICE considered various factors, both positive and negative, prior to revoking Mr. Diaw's OSUP. But the I-213 was prepared by Mr. Martinez-Contes — a deportation officer — and thus this document does not shed light on Mr. Rose's opinions before revoking Mr. Diaw's revocation. And on its face, the I-213 lacks credibility: It incorrectly says that Mr. Diaw has "no hearings, appeals, applications, petitions, or waivers pending" while correctly acknowledging a few paragraphs later that he has a pending I-130, only to conclude (again wrongly) that he has no petitions pending. Mr. Diaw's I-213 also mislabels him as Mr. "Duong" several times, as shown below:

```
Immigration History:
On 1/27/2022, U.S. Border Patrol (USBP) arrested DIAW entering the United States at Del Rio,
TX. USBP processed DIAW as an Expedited Removal with credible Fear.
On 2/18/2022, United States Citizen and Immigration Services determined negative fear on
DIAW's claim.
On 3/15/2022, ICE released DIAW under Order of Supervision.
On 1/31/2025, DIAW spouse files an I-130 Petition for Alien Relative under IR1/CR1-spouse of
USC, 201(b). The petition is in process.

Criminal History:
DIAW has no criminal record.

Health & Humanitarian:
DUONG denied any significant humanitarian concerns.

DUONG made a 5-minute phone call to his wife.

DUONG declined his right to speak with the Senegalese Consulate.

DUONG claim fear of removal to Senegal.
```

DI 4-1 at 2. Thus, if anything, this document is evidence that the government's process for revoking Mr. Diaw's OSUP was haphazard.

Next, the government cites several cases for the proposition that there was sufficient evidence in the record to conclude that Mr. Rose lawfully revoked Mr. Diaw's OSUP. But none of these cases is on point. The closest of these is *Reyes v. Jamison*, No. CV 26-1324, 2026 WL 970231, at *1 (E.D. Pa. Apr. 9, 2026) (Kenney, J.). That case involved a habeas petitioner who had three unlawful entries into the United States as well as a felony conviction for drug trafficking. *Id.* at *6. After the petitioner's third unlawful entry, he was placed on an OSUP, which the government later revoked when he violated a condition of release for allegedly driving under the influence. *Id.* at *3. As with Mr. Diaw, the petitioner's OSUP was revoked by an Acting Field Office Director (AFOD), and the AFOD did not make explicit findings that revocation was in the public interest and circumstances did not reasonably permit referral to the EAC. *Id*. at *5. Judge Kenney reasoned that "the reasons supplied in the Notice [of Revocation of Release] detailing how Petitioner violated a condition of his OSUP . . . and the notes . . . in the OSUP Revocation Worksheet explaining that Petitioner is subject to a final removal order and has a prior felony conviction . . . are sufficient to show that the Acting Field Office Director, who

signed the Notice, made the determination that revocation of Petitioner's release is in the public interest." *Id.*

Our situation is materially different. Mr. Diaw does not have a prior felony conviction nor did he violate a condition of his OSUP. Rather, the only reasons Mr. Rose provided for revoking Mr. Diaw's OSUP in his Notice of Revocation of Release were that: (1) "It is appropriate to enforce the removal order entered against you as ICE has the ability and means to effectuate your removal"; (2) "ICE is seeking a travel document to effect your expeditious removal to Senegal"; and (3) "On March 1, 2022, you were ordered removed to Senegal." DI 4-3 at 3. Simply enforcing a removal order does not bear as obvious a connection to the public interest as removing a criminal from the streets, which Judge Kenney acknowledged in *Reyes* when he cautioned that courts can infer that the district director made the required factual findings only when it is "apparent from the record." *Reyes*, 2026 WL 970231, at *5. In fact, in another OSUP revocation case in front of Judge Kenney where the petitioner's Notice of Revocation of Release offered the exact same reasons for revocation as that provided to Mr. Diaw, Judge Kenney granted the petitioner's release, and acknowledged that "it appears that the Acting Field Office Director did not make a factual finding that revocation was 'in the public interest' and that the 'circumstances do not reasonably permit referral of the case to the Executive Associate Commissioner,' as required by the regulation." *Martinez v. Jamison*, No. 26-CV-00718, 2026 WL 700335, at *5 n.6 (E.D. Pa. Mar. 12, 2026).

At the hearing, the government suggested that removing aliens with final orders of removal is always in the public interest. DI 25 at 26. Fair enough. But that is true in every removal case. By requiring the district director to conclude that revocation is in the public interest, the regulations suggest that the district director must be of the opinion that deporting the

individual in question promotes the public interest in some specific way discernable from the record. *See Martinez*, 2026 WL 700335, at *5 n.6 ("Respondents provided no evidence that either the 'public' or Congress have an interest in removing non-criminal noncitizens who have been residing in the United States for decades in full compliance with their OSUP, or as to why it is all of a sudden in the 'public interest' to effectuate Petitioner's removal, when the Government has failed to act on his final order of removal for over twenty years."). The record in our case does not clearly indicate that Mr. Rose made this conclusion.[8]

The other cases the government cites also do not help their cause. The government asks us to look to *Santamaria Orellana v. Baker*, No. 25 cv-1788, 2025 WL 2841886, at *4 (D. Md. Oct. 7, 2025) and *Ceesay v. Kurzdorfer*, 781 F. Supp. 3d 137, 163–164 (W.D.N.Y 2025) for the proposition that a district director can revoke an alien's OSUP. But we do not disagree with this premise. A district director *can* revoke an OSUP but first must make the required factual findings. Both *Santamaria Orellana* and *Ceesay* agree with this point: The court in *Santamaria Orellana* emphasized that a Field Office Director is authorized to revoke an OSUP only when, in "the [Field Office Director's] opinion, revocation is in the public interest and circumstances do not reasonably permit referral of the case to the Executive Associate [Director]" and reasoned in

[8] None of this is meant to question Mr. Rose's reasons (if there were any) for revoking Mr. Diaw's OSUP, whatever they may have been. *See* 8 U.S.C. § 1252(g) ("[N]o court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."). But there is a difference between second-guessing Mr. Rose's decisions (which we cannot do) and reviewing if he made the required factual determinations before exercising his discretion, which is within our authority. *See Reyes,* 2026 WL 970231, at *3 ("[T]his Court will not review whether Respondents' discretionary decision to revoke Petitioner's OSUP was proper but rather whether Respondents complied with their own revocation procedures when doing so."); *Gonzalez v. Reno*, 212 F.3d 1338, 1349 (11th Cir. 2000) ("[T]he courts retain the authority to check agency policymaking for procedural compliance and for arbitrariness.").

this case that there is “no documentation or even a claim that [Field Office Director] Baker or any other Field Office Director made such a determination.” 2025 WL 2841886, at *3. Meanwhile, in *Ceesay,* the court granted petitioner’s release because, among other factors, “the government has not alleged that [Assistant Field Office Director] Robinson made the requisite findings [that revocation was in the public interest and circumstances did not reasonably permit referral to the EAC] —explicitly or otherwise—before revoking Ceesay's release.” 781 F. Supp. 3d at 162.

The government lastly cites to *Barrios v. Ripa*, No. 1-25-cv-22644, 2025 WL 2280485, at *7 (S.D. Fla. Aug. 8, 2025) for its proposition that § 241.4 “does not mandate that the revoking official explicitly state in the Notice of Revocation of Release that the revocation was in the public interest and that the matter could not be referred to the Executive Associate Commissioner.” Again, no quarrel, because § 241.4(l)(2) does not require that the district director lay out his/her findings in writing. But § 241.4(l)(2) *does* mandate that the district director be of the opinion that revocation is in the public interest and circumstances do not reasonably permit referral to the EAC, and when we asked the government for any evidence on this front, the government produced nothing and declined to call Mr. Rose at the hearing. All in all, the government has not met its burden in showing that its defense of Mr. Rose’s conduct was substantially justified.

**B. The government’s defense of the process that Mr. Diaw received following his OSUP revocation was not substantially justified**

We also find that the government’s defense of the process that Mr. Diaw received following his OSUP revocation was not substantially justified. As background, 8 C.F.R. § 241.4(l) mandates that “[u]pon revocation [of an alien’s OSUP], the alien will be notified of the reasons for revocation of his or her release or parole [and] . . . be afforded an initial informal

interview promptly after his or her return to Service custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification." § 241.4(l)(1). Thus, the government was required to provide Mr. Diaw with notice and an opportunity to be heard after detaining him on February 5, 2026.

In response to this, the government first argued that Mr. Diaw was not entitled to these procedural protections because they are listed in § 241.4(l)(1) of the regulations and Mr. Diaw was detained pursuant to § 241.4(l)(2). However, while § 241.4(l) is "not a model of clarity" *see Zhu v. Genalo*, 798 F. Supp. 3d 400, 410 (S.D.N.Y. 2025), we do not find the government's argument has a reasonable basis in law for several reasons. First, ICE acted as though Mr. Diaw was entitled to the procedural protections in § 241.4(l)(1): Mr. Diaw's "Notice of Revocation of Release" explained ICE's reasons for revoking his OSUP and said that he would be afforded an informal interview at which he could "submit any evidence or information [he] wish[ed] to be reviewed in support of [his] release." A part of the notice is excerpted below:

> **Alien Name:** DIAW, Moussa
> **Alien Number:** [redacted]
>
> **Notice of Revocation of Release**
>
> Your release on the order of supervision (OSUP) issued to you on or about March 4, 2022, is hereby revoked. You will remain detained in U.S. Immigration and Customs Enforcement (ICE) custody at this time.
>
> ☒ Your release has been revoked pursuant to 8 C.F.R. § 241.4(l), for the following reason(s):
>
> ☒ It is appropriate to enforce the removal order entered against you as ICE has the ability and means to effectuate your removal.
>
> ☒ ICE is seeking a travel document to effect your expeditious removal to Senegal.
>
> ☒ On March 1, 2022, you were ordered removed to Senegal.
>
> **<u>Notice of Informal Interview</u>**
>
> On February 12, 2026, you will be afforded an informal interview at which you will be given an opportunity to respond to the reasons for this revocation. You may submit any evidence or information you wish to be reviewed in support of your release.

DI 4-3 at 3. ICE taking these steps "suggests that the government's stance that no informal interview is required in [Mr. Diaw's] situation is a 'post hoc rationalization[ ] of past agency

action' that should not be given deference." *Ceesay*, 781 F. Supp. 3d at 163 (quoting *Lockheed Martin Corp. v. Morganti*, 412 F.3d 407, 411 (2d Cir. 2005)).

Second, the text of § 241.4(l) — when read as a whole — supports the proposition that Mr. Diaw was entitled to the procedural protections in (l)(1) despite being detained pursuant to (l)(2). First, (l)(1) and (l)(2) "are not titled so as to suggest that they are addressed to mutually exclusive populations." *Funes v. Francis*, 810 F. Supp. 3d 472, 490 (S.D.N.Y. 2025). Rather, "(l)(1)" is titled "Violations of conditions of release" and "(l)(2)" is titled "Determination by the Service." This tends to show that "the two provisions, rather than delineating separate populations, address different topics within the broader ambit of section (*l*) . . . The first subsection sets out procedural protections in connection with revocation. The second enumerates the bases on which ICE may exercise its discretion to revoke an OSUP." *Id.* at 491.

Second, (l)(2) includes "as one 'discretionary' basis on which ICE may revoke an OSUP, 'violat[ing] any condition of release.'" *Id.* (citing 8 C.F.R. § 241.4(l)(2)(ii)). "This overlap [between § 241.4(l)(1) and § 241.4(l)(2] belies the Government's argument that these are two separate processes, and suggests that paragraph (l) sets forth a unified set of procedures for the revocation of removal." *Zhu*, 798 F. Supp. 3d at 410.

Third, the ensuing provision — § 241.4(l)(3) — establishes a review process applicable to all aliens, "[i]f the alien is not released from custody *following the informal interview provided for in paragraph (l)(1) of this section*." (emphasis added). This language "seems to imply that the informal interview provided for in paragraph (l)(1) of this section applies to all regardless of whether or not release is revoked for a violation." *Ceesay*, 781 F. Supp. 3d at 164 (citation modified); *see also Funes* 810 F. Supp. 3d at 491 ("That the review process required by (*l*)(3) is triggered by the interview mandated in (*l*)(1) supports [Diaw's] argument that the procedural

protections in (*l*)(1)—notice and an informal interview 'promptly after his or her return to [ICE] custody'—extend to all noncitizens whose OSUPs have been revoked.").[9]

Against this backdrop, courts have overwhelmingly found that petitioners detained under § 241.4(l)(2) have the same procedural protections as those detained under § 241.4(l)(1). *See e.g. Martinez*, 2026 WL 700335 at *3; *Dudamel v. Jamison*, No. CV 26-361, 2026 WL 498612, at *4 n.6 (E.D. Pa. Feb. 23, 2026); *Zhang v. Genalo*, 814 F. Supp. 3d 307, 323 (E.D.N.Y. 2025); *Ceesay*, 781 F. Supp. 3d at 163-64; *Funes* 810 F. Supp. 3d at 490-93; *Zhu*, 798 F. Supp. 3d at 410-13; *see also Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1019 (2025) ("[I]n order to revoke conditional release, the Government must provide adequate notice and 'promptly' arrange an 'initial informal interview . . . to afford the alien an opportunity to respond to the reasons for the revocation stated in the notification'") (statement of Sotomayor, J.) (quoting 8 C.F.R. § 241.4(l)).

The government cites zero authority for its proposition that petitioners detained under § 241.4(l)(2) have no right to notice and an informal interview. *See Pierce v. Underwood*, 487

[9] We note as a final point that the government's reading of § 241.4(l)(2) — that ICE could revoke an alien's OSUP without giving him/her notice or a preliminary opportunity to contest his/her detention — implicates procedural due process concerns. *See Serrano-Alberto v. Att'y Gen. U.S.*, 859 F.3d 208, 211 (3d Cir. 2017) ("The Fifth Amendment protects the liberty of all persons within our borders, including aliens in immigration proceedings who are entitled to due process of law—that is, a meaningful opportunity to be heard—before being deported."). True, § 241.4(l)(3) requires ICE to provide an alien with an interview approximately three months into his/her detainment. But three months is a significant amount of time to be detained without process, and many district courts have ruled that ICE's refusal to provide an alien with a preliminary interview after revoking his/her OSUP constitutes a due process violation. *See e.g.*, *Martinez*, 2026 WL 700335 at *8; *Funes* 810 F. Supp. 3d at 499-501; *Zhu*, 798 F. Supp. 3d at 414. The government's reading of § 241.4(l) also creates the odd result that aliens who violate their conditions of release under (l)(1) receive more process than aliens — like Mr. Diaw — detained under (l)(2) who have complied with their obligations of supervision. "That cannot be—and is not—the law." *Ceesay*, 781 F. Supp. 3d at 164.

U.S. 552, 568-69 (1988) (Finding that "the views of other courts on the merits" can be relevant to whether a litigant's position has "objective indicia" of "substantial justification"). Therefore, for these reasons, we find that the government was not substantially justified in arguing that Mr. Diaw was not entitled to the procedural protections in § 241.4(l)(1).

In the alternative, the government argues that ICE *did* provide Mr. Diaw with the procedural protections found in § 241.4(l)(1). But this argument was not substantially justified either. Starting with notice, the government said that it fulfilled this obligation by serving Mr. Diaw with the "Notice of Revocation of Release." But this notice was inadequate for several reasons. First, the notice was not provided "upon revocation," because Mr. Diaw was already detained for around two hours when he was handed the relevant paperwork. DI 25 at 11; *see also Funes*, 810 F. Supp. at 494 (finding petitioner's notice was not received "upon revocation" when "she did not receive the notification until many hours after revocation"). Second, Mr. Diaw did not understand the notice because it was written in English, and ICE did not help by, for example, providing a translator or allowing him to speak with his attorney for more than a few minutes on the day of his arrest. *See* DI 9-1 at ¶ 5; DI 25 at 11; *see also Nu-Look Design, Inc. v. Comm'r,* 356 F.3d 290, 295 (3d Cir. 2004) ("It is well settled that an elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.") (citation modified). Third, and most critically, the notice was signed by Mr. Rose, whom, as we explained earlier, the government has not established properly revoked Mr. Diaw's OSUP.

The government's representation that Mr. Diaw received an informal interview is even more problematic. As described above, the only contact that Mr. Diaw had with ICE following

his OSUP revocation went as follows: two agents came to visit him and asked him for his identification. After turning it over, the agents asked Mr. Diaw what language he spoke, to which he said a little English, and Wolof. The agents then told him they had no information about his case, but that he could be transferred to another facility soon. That was their full conversation. DI 25 at 11-13. In the face of these facts, our exchange with the government at the hearing went as follows:

> The Court: Okay. And then the last question is, what evidence is there in the record that the alien was afforded an initial informal interview?
>
> Government Counsel: The department -- respondents have not set forth any of that evidence, Your Honor. I will note in the declaration, the petitioner does talk about I'll be in a very informal interview on February 9th, 2026, while he was in detention, that would be the evidence at the time the government has to point to this informal interview. And I would just notice, I noted in my [ ] supplemental briefing order that this is an informal interview, and there is one set forth in the regulations to be conducted in three months' time that is much more formal than the informal interview that is required to begin in under [§ 241.4(l)(1)]. And that's in [§ 241.4(l)(3)] . . . So, in contrast to the informal interview language we have in [§ 241.4(l)(1)], the government's argument is that a very informal interview was completed on February 9th with a subsequent interview to be scheduled in no more than three months' time that memorializes much more of revocation process.

DI 25 at 28-29.

We find the government's arguments on this topic unreasonable. The government is correct that § 241.4(l)(3) establishes a more formal interview process for aliens who remain in custody for around three months. But Mr. Diaw's right to this later interview does not nullify his right to the initial interview set out in § 241.4(l)(1). In sum, Mr. Diaw was denied his chance to "promptly. . . respond to the reasons for revocation stated in the notification," § 241.4(l)(1), and the government's representations to the contrary have no basis in fact.[10]

[10] The government citations to *Quan v. Mullin*, No. 26-cv-02036, 2026 WL 1597470, at

## IV. Conclusion

For the reasons explained above, we grant Mr. Diaw's motion for attorneys' fees.[11] An appropriate order follows this memorandum.

---

*5 (E.D. Pa. June 3, 2026) and *Rondon Reyes*, 2026 WL 970231 at *4 do not help its cause as in both cases the government afforded the petitioner an interview within one to two weeks of his OSUP revocation. Here, in contrast, Mr. Diaw was detained for over a month — from February 5th until March 11th — and he never received an interview.

[11] As for the fees themselves, we note that the government does not contest the very modest amount that Mr. Diaw requests, and we find Mr. Diaw's request reasonable for the entirely persuasive reasons stated in his motion. *See* DI 18 at 10-12.